**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARLON WISE,

      Plaintiff,

        v.                                  Civil Action No. 10-1899 (JEB)

DAVID S. FERRIERO,
Archivist of the United States National
Archives and Records Administration,

      Defendant.

## MEMORANDUM OPINION

From 2006 to 2008, Plaintiff Marlon Wise, who is black, alleges that he was subjected to severe harassment, in violation of Title VII, at the hands of two managers in the microfilm lab at the National Archives and Records Administration. One manager – Carlton Barnes, who is also black – allegedly called Wise a "punk ass nigger," wrongly attempted to have him disciplined multiple times, and rejected him for a promotion. After Wise complained about Barnes, the other supervisor – Clarence Simmons – allegedly told him that he was "burning his bridges" by complaining, barred him from routine training opportunities, made sure he was denied yet another promotion, and deprived him of access to facilities he needed to advance in his career. Anxious to escape what he perceived as retaliation and racial hostility, Wise secured a detail to another lab around the end of 2008 and was later transferred to that office permanently. Although he remained unhappy with several aspects of his new job, the hostility from Barnes and Simmons ceased.

A couple of years after his transition to the new lab, Wise brought this suit formally complaining about his treatment at the hands of Barnes and Simmons, in addition to other, more

recent slights.  In a previous Memorandum Opinion, this Court permitted Wise to proceed only on his claims for a hostile work environment and not on any discrete claims of retaliation, which had not been exhausted.  See Wise v. Ferriero (Wise I), 842 F. Supp. 2d 120 (D.D.C. 2012).  Defendant NARA now moves for summary judgment, arguing, *inter alia*, that Wise's transfer constitutes an intervening action that removed him from his prior, arguably hostile, work environment.  Because the Court ultimately agrees both that the earlier, unexhausted incidents were not connected to later, exhausted ones and that no reasonable jury could find Wise's current environment hostile, it will grant NARA's Motion.

## I.      Background

Many of the facts in this case are disputed.  On a motion for summary judgment, the Court takes the evidence of the non-movant – here, Wise – as true and views the facts in the light most favorable to him.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Wise began his career at NARA in 2001 as a technician and was later promoted to the position of microfilm-equipment operator.  See Opp., Exh. 1 (Declaration of Marlon Wise I), ¶ 3; Mot., Exh. 2 (Deposition of Marlon Wise I) at 10:12-11:10.  From 2001 to 2006, Wise's office environment in the microfilm lab was relatively placid.  See Wise Decl. I, ¶¶ 4-5.  His supervisors consistently evaluated him as "outstanding," and he was granted multiple promotions and performance awards.  See id.; ECF No. 30-19 (Wise Awards) at 10-19.  According to Wise, however, all of this "dramatically changed" in 2006.  Wise Decl. I,  ¶ 6.

Early that year, Wise attempted to speak with his second-level supervisor, Clarence Simmons, while Simmons was in conversation with the head of another microfilm lab.  See Wise Depo. I at 17:15-20:2.  After Wise interrupted the conversation and while Simmons's back was turned, the other supervisor – Carlton Barnes – allegedly told Wise he was a "punk-ass nigger."

Wise Decl. I, ¶ 7.  Barnes, like Wise, is black.  See Wise Depo. I at 21:18-19.  Understandably, the insult left Wise feeling hurt and offended, see Wise Decl. I, ¶¶ 9, 11, although he conceded in his deposition that, in his mind, there is "no racial slur" when the insult comes from "a black man to a black man."  Mot., Exh. 3 (Deposition of Marlon Wise II) at 79:5-9.  Wise first complained about this incident to Simmons, who claimed he had not heard the remark, but "if [he] had heard something like that, [he] would do something about it."  Wise Decl. I, ¶ 12.  In 2007, Wise notified Simmons's supervisor, Doris Hamburg, about the insult.  See id., ¶ 13.  No reprimand, apparently, was issued to Barnes.

Shortly after those conversations took place, Wise's immediate supervisor, Dorothy Gregory, informed Wise that he would not be trained on several new pieces of lab equipment, unlike other lab employees.  See id., ¶ 14.  He was also forbidden to take on any duties outside of filming and was barred from the quality-control lab.  See id.  Wise claims that these activities were necessary for him to advance in his career.  See id.  Gregory testified that Wise was not allowed to undertake some of these activities, such as working at the quality-control lab, because of complaints she had received from customers about Wise having a difficult personality.  See Mot., Exh. 6 (Deposition of Dorothy Johnson-Gregory) at 34:7-38:10.  She also averred that there was only one piece of equipment in the lab – a microfilm scanner – that Wise already knew how to use.  See id. at 30:13-31:9, 32:7-13.

Wise nonetheless spoke to Gregory's supervisors about this alleged denial of training and eventually filed an EEO complaint.  See Wise Decl. I, ¶¶ 15-17.  Simmons, who was Gregory's supervisor, promised to remedy the lack of training, and the EEO complaint was ultimately withdrawn.  See id., ¶¶ 18-19.  Wise, however, later discovered that it was Simmons himself who had originally ordered Gregory to deny him training.  See id.  Unsurprisingly, then, even after

Simmons had vowed to address the situation, Wise continued to receive fewer professional-development opportunities than his co-workers.  See id., ¶¶ 20-21.  Wise believes that Simmons was retaliating against him for complaining about the Barnes incident.

Around the same time that Wise's training was curtailed, Barnes approached him to ask about a microfilm job that had been stopped.  See id., ¶ 22; Wise Depo. I at 40:3-45:11.  Wise "ignored him because [Barnes] didn't know what he was talking about."  Wise Depo. I at 44:13-14.  As a result, Barnes became frustrated and tried to have Wise disciplined by writing him up; however, his attempts were unsuccessful because he was not in Wise's chain of command.  See id. at 45:3-11; Wise Decl. I, ¶ 26.

Despite the fact that Barnes's attempt to punish him had failed, Wise insisted on speaking with Human Resources; with Hamburg, his third-level manager; and with Michael Kurtz, who is Hamburg's superior, about this latest incident.  See Wise Decl. I, ¶¶ 24-29.  He also expressed concern because he had heard rumors that Barnes might be taking over supervision of his lab, an outcome Wise did not desire.  See id., ¶ 27.  At this early juncture, while both Human Resources and Hamburg told him that nothing could be done, see id., ¶¶ 24-28, Kurtz said that he would at least speak with Simmons and Hamburg about the Barnes situation.  See id., ¶ 29.  Two days later, Simmons told Wise to stop complaining to managers like Kurtz and Hamburg because he "was burning his bridges."  See id., ¶ 30.  A month after this, Barnes attempted to discipline Wise by writing him up a second time.  See id., ¶ 31.  His attempt was rejected because, again, Wise was not under his supervision.  See id.

In 2008, at least two vacancies were advertised in Wise's lab, both of which would have been promotions for him.  See id., ¶ 32.  He applied to both and believed he was the most qualified applicant from his lab.  See id.  Upon hearing that Wise was applying for the

promotions, Barnes told him, "If you are selected for a promotion, I will retire from the federal government." See id., ¶ 33. In something of an ironic twist, however, Barnes was then appointed to a new position and became the hiring officer for at least one of the vacancies, which was a team leader position within the lab. See Wise Decl. I, ¶ 34; Supp. to Mot., Exh. 2 (Pl. Interrog. Resp.) at 7. As promised, Wise did not receive the promotion. See Wise Decl. I, ¶ 34. Simmons was involved in the hiring process for the other vacancy, which was a mechanical engineer position. See Pl. Interrog. Resp. at 7-8. Although Wise was initially deemed qualified for the spot, Simmons asked that his qualifications be reconsidered – apparently, Simmons thought Wise had misrepresented his professional background and skill set. See id.; Opp., Exh. 16 (Simmons Email of Apr. 24, 2008). Wise was then determined to be unqualified, and the vacancy itself was withdrawn. See Pl. Interrog. Resp. at 7-8. A report later issued by NARA's Office of the Inspector General suggested that, in reality, Wise was not promoted because of his "poor interpersonal skills," since the leadership positions he applied for "would require increased daily interactions with personnel." See Reply, Exh. CC (Inspector General Report) at 2.

In October of 2008, Wise was again denied training – this time, he missed out on a two-day session that all the other employees in his lab received. See Wise Decl. I, ¶ 37. He claims that Barnes was responsible for his exclusion. See id. When he complained to Hamburg and Kurtz about the missed training, he discovered that – much to his dismay – he was about to be transferred into a work group supervised by none other than Barnes himself. See id., ¶ 38.

Wise took up the Barnes issue with NARA's Labor Relations and Human Resources divisions. While Human Resources did not address the racial epithet – calling it a "cultural thing" – the Department did agree to detail Wise away from Barnes. See id., ¶¶ 41-42. From late 2008 or early 2009 on, then, Wise was working as a digital-imaging technician, separated

from Barnes.  <u>See</u> Wise Depo. I at 120:1-121:10.  As part of the agreement to be detailed away

from Barnes's microfilm lab, Wise agreed to meet a daily quota for converting hard-copy

pictures into digital images.  <u>See</u> Wise Decl. I, ¶ 44.  None of his co-workers was subject to a

quota.  <u>See</u> <u>id.</u>

       Since the day he was detailed, Wise has not interacted with Barnes.  <u>See</u> Wise Depo. II at

13:9-12.  Barnes does not evaluate his work, and Wise has not provided any evidence indicating

that either Barnes or Simmons had any influence over Wise's work environment from late 2008

on.  <u>See</u> Wise Depo. I at 82:23-24.

       Despite having requested the detail to the digital-imaging lab, Wise remains dissatisfied.

He contends that he does not receive the training, education, or growth opportunities that he

would have received as a microfilm technician – even though he had reached the top rung of his

career ladder (a GS-8 ranking) and hence had limited opportunities in that position.  <u>See</u> <u>id.</u> at

11:17-13:15; Wise Decl. I, ¶ 43.  His new supervisor also gave him slightly lower job-

performance ratings than he had received in the microfilm lab, breaking his previous string of

"outstandings."  <u>See</u> Wise Decl. I, ¶ 45; Wise Depo. I at 79:16-25.  He has contested several of

those ratings and had them raised somewhat.  <u>See</u> Wise Depo. I at 79:16-25.  He continues to

receive "spot awards" and bonuses consisting of extra days off, but he avers that he has not

received a cash award since entering the digital-imaging detail.  <u>See</u> Wise Decl. I, ¶ 45.  He

speculates that this is because of his disagreement with Barnes, even though Barnes himself has

never been responsible for evaluating Wise's performance.  <u>See</u> <u>id.</u>; Wise Depo. I at 82:23-24.

Wise's own evidence, however, shows that he did in fact receive a cash award at the end of 2009

after being detailed, <u>see</u> Wise Awards at 3, and Archives' undisputed evidence shows that he

received another cash award in 2011.  See Supp. to Mot., Exh. 25 (Cash Award Documentation) at 7, 9.

Despite his reassignment to a new lab and the years that had passed since 2006, Wise was determined not to let the issue rest until Barnes was punished.  See Wise Decl. II, ¶¶ 2-3.  In an attempt to have discipline meted out, Wise contacted both Senators from Maryland as well as his Congresswoman, who then reached out to the administration at NARA.  See Wise Decl. I, ¶ 2. As a result of Wise's efforts, an Office of the Inspector General inquiry was launched, which found no evidence that Wise's career had been hindered in any way by Barnes's comment or by retaliatory actions.  See Inspector General Report at 2.

Wise nonetheless continued to pursue the issue within NARA by seeking an audience with the head of the agency, Acting Archivist Adrienne Thomas, who is white.  See Wise Decl. I, ¶¶ 46-52.  He contacted her Chief of Staff in 2008 and then again in 2009, but each time he was told that he should work with the EEO rather than attempt to meet with the head of the agency. See id.  Undeterred, in September 2009, Wise tried to personally deliver a letter to Thomas.  He stood outside her fourth-floor offices waiting for her, which apparently made her staff – who had already told Wise that he needed to go through the EEO – uncomfortable.  See id., ¶ 50; Supp. to Mot., Exh. 16 (Nov. 23, 2009 Email from Kevin McCoy) at 1.  Thomas's staff called a security guard, who agreed to deliver the letter for Wise and to report back.  See McCoy Email at 1.  Still, Wise was upset that he could not meet with the Archivist personally, and he attempted to deliver his letter yet again later that month.  See id.  After standing outside Thomas's office for a while and then leaving, Wise was contacted by both the security officer and his branch chief, who told to him to steer clear of the fourth floor.  See id.; Wise Decl. I, ¶¶ 51-52.  The security officer noted that attempting to ambush the Acting Archivist would not help Wise's cause.  See McCoy

Email at 1. Wise perceived this treatment as racial discrimination and filed another EEO complaint. See Wise Decl. I, ¶ 53.

In December 2010, Wise alleges that he was targeted yet again, either as a result of racial hostility or retaliation. See id., ¶ 55-56. In late 2010, Barnes was responsible for compiling a list of employees who had worked on a project documenting the Holocaust; those employees would receive recognition and a cash award. See id. Barnes claims he listed only employees who were under his supervision and who had worked on the project at its completion – and Wise, of course, was neither under Barnes's supervision nor working in the microfilm lab at the time. See Mot., Exh. 5 (Deposition of Carlton Barnes) at 115:6-117:19. As a result, several employees who had worked on the Holocaust Project in its earlier stages, including Wise, were left off the list and excluded from the award ceremony for the project. See id.; Supp. to Mot, Exh. 22 (Declaration of Doris Hamburg), ¶¶ 2-6; Exh. 24 (Declaration of Martin Jacobson), ¶¶ 4-6. When Wise found out about the error, he filed another EEO complaint. See Wise Decl. I, ¶ 56. Once notified of the omission, however, Archives attempted to remedy the situation and provided all the relevant employees – including Wise – with a certificate of recognition and the same cash bonus the other employees had received. See id.; Declaration of Doris Hamburg, ¶¶ 2-6; Cash Award Documentation at 2-15.

Finally, Wise claims that he was discriminated against when he attempted to permanently transfer to the digital-imaging lab so that he would no longer be there on detail. He contends that there was a delay of over a year in the transfer, and he suspects that the delay occurred either because of the unpleasantness with Barnes or because he is black. See Wise Depo. I at 11:20-12:19; Opp. at 30. He also complains that he and several other black employees were transferred into grade-eight positions rather than grade-nine positions. See Wise Depo. I at 49:20-59:6. He

observes that some white imaging technicians are grade nines – although it appears from the record that those employees were working in grade-nine positions before their transfer and that Wise and other grade-eight imaging technicians, regardless of their race, were transferred in from grade-eight positions. See id. Still, Wise suspects that the grade differentials are race related. He concedes, however, that Barnes had nothing to do with the transfer process to his current position. See id. at 11:20-12:19, 58:25-59:6; Opp. at 30.

In November 2010, Wise filed suit in this Court based on the 2009 and 2010 EEO complaints. His most recent Complaint alleges that he was subjected to a hostile work environment based on race and retaliation. See Second Amend. Compl. at 11. In February of 2012, the Court denied Archives' Motion to Dismiss in regard to any hostile-work-environment claims, but held any retaliation claims would be dismissed as unexhausted. See Wise I, 842 F. Supp. 2d 120. Defendant now moves for summary judgment, arguing, among other things, that Wise's current work environment is not hostile and that his earlier claims are time barred for failure to exhaust.

## II.    Legal Standard

NARA moves here for judgment on the pleadings or, in the alternative, for summary judgment. As it – and the Court – relies on record evidence outside the pleadings themselves, the Court will treat the Motion as one for Summary Judgment. Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is

"genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor.  See Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.     Analysis

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), or "because he has made a charge . . . or participated in any manner in an investigation" of employment

discrimination.  Id. § 2000e-3(a).  The Supreme Court has held that these provisions make it

unlawful for an employer to "requir[e] people to work in a discriminatorily hostile or abusive

environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  A hostile work environment

can result from either discrimination or retaliation under Title VII.  See, e.g., Harris v.

Wackenhut Servs., Inc., 419 Fed. Appx. 1, 1 (D.C. Cir. 2001) (per curiam) (discrimination);

Singletary v. District of Columbia, 351 F.3d 519, 526 (D.C. Cir. 2003) (retaliation).  Wise has

made both claims, alleging that he was subjected to a hostile work environment both because of

his race and because of his protected activity.  See Second Am. Compl. at 11.

To prevail on a hostile-work-environment claim under either a discrimination or a

retaliation theory, "a plaintiff must show that his employer subjected him to 'discriminatory

intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment.'"  Baloch v. Kempthorne,

550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting Harris, 510 U.S. at 12).  "To determine whether a

hostile work environment exists, the court looks to the totality of the circumstances, including

the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it

interferes with an employee's work performance."  Id. at 1201 (citing Faragher v. City of Boca

Raton, 524 U.S. 775, 787-88 (1998)).  "The Supreme Court has made it clear that 'conduct must

be extreme to amount to a change in the terms and conditions of employment.'"  George v.

Leavitt, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting Faragher, 524 U.S. at 788).  By adhering to

these standards, the Court thereby "ensure[s] that Title VII does not become a general civility

code" that involves courts in policing "the ordinary tribulations of the workplace."  Faragher,

524 U.S. at 788 (citation and internal quotation marks omitted).

In its Motion, NARA makes a number of arguments. Its two strongest are that Wise did not exhaust the earlier, more egregious incidents and that the later ones are insufficient by themselves to constitute an actionable work environment. The Court takes each point separately and then considers Wise's sole remaining objection.

A. Exhaustion

A hostile-work-environment claim, like any Title VII cause of action, must be timely made and may be filed only after the relevant administrative remedies have been exhausted. See Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010). To fully exhaust his administrative remedies, a federal government employee must first "consult a Counselor . . . in order to try to informally resolve the matter" within 45 days of the incident. 29 C.F.R. § 1614.105(a); see Steel v. Schafer, 535 F.3d 689, 693 (D.C. Cir. 2008). If the issue cannot be resolved through counseling, the EEO Counselor must inform the employee of the right to file a formal complaint. 29 C.F.R. §§ 1614.105(d), 1614.106(b); Hamilton v. Geithner, 666 F.3d 1344, 1350 (D.C. Cir. 2012). After filing a complaint, the employee may initiate a civil action after the agency issues an adverse final decision or after 180 days elapse without a decision, whichever happens first. 42 U.S.C. § 2000e-16(c). "Because untimely exhaustion of [Title VII] administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it." Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997) (citation omitted).

Both parties agree here that the only two timely exhausted and filed claims relate to the incidents in the Acting Archivist's fourth-floor offices and Wise's omission from the list of Holocaust Project awardees. See Mot. at 15; Opp. at 16-17, 33-34.

This, however, does not necessarily doom Wise's case. Ordinarily, an employee must exhaust the administrative process and timely file claims for each discrete act of discrimination.

See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 (2002); Coleman-

Adebayo v. Leavitt, 326 F. Supp. 2d 132, 137 (D.D.C. 2004). Yet hostile-work-environment

claims are different. As the Supreme Court noted in Morgan, such claims by "their very nature

involve[] repeated conduct," not just discrete acts. 536 U.S. at 115. For purposes of exhaustion

and timeliness, the "unlawful employment practice . . . cannot be said to occur on any particular

day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a

single act of harassment may not be actionable on its own." Id. Because a hostile-work-

environment claim is composed of a series of separate acts that collectively constitute one

"unlawful employment practice,"

> [t]he timely filing provision only requires that a Title VII plaintiff
> file a charge within a certain number of days after the unlawful
> practice happened. It does not matter, for purposes of the statute,
> that some of the component acts of the hostile work environment
> fall outside the statutory time period. Provided that an act
> contributing to the claim occurs within the filing period, the entire
> time period of the hostile environment may be considered by a
> court for the purposes of determining liability.

Id. at 117 (emphasis added). The same reasoning applies to exhaustion: If the administrative

remedies concerning one act that contributed to the hostile environment have been exhausted,

then all of the other, related acts are properly before the Court. See Singletary, 351 F.3d at 526-

27 & n.9.

   Wise, however, is not home free because there is one wrinkle – and a substantial one.

The unexhausted or time-barred incidents must still be "part of the same actionable hostile work

environment practice" as the exhausted, timely acts. Morgan, 536 U.S. at 120. If, for example, a

timely, fully exhausted claim regarding an act "on day 401 had no relation to the acts between

days 1-100 [where the statute of limitations is 300 days], or for some other reason, such as

certain intervening action by the employer, was no longer part of the same hostile environment

claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act." Id. at 118. Actions "qualify as 'part of the same actionable hostile environment claim,'" then, "only if they are adequately linked into a coherent hostile environment claim – if, for example, they 'involve[ ] the same type of employment actions, occur[ ] relatively frequently, and [are] perpetrated by the same managers.'" Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (quoting Morgan, 536 U.S. at 120-21). If, however, "certain intervening action by the employer" curtailed the original hostility, then stale claims cannot be revived. Morgan, 536 U.S. at 118.

Our question here is now teed up: Are the two incidents that have been properly exhausted and timely filed – i.e., those involving Wise's reprimand after loitering outside the Acting Archivist's office and his omission from the list of Holocaust Project awardees – part of one continuous hostile work environment along with all of the other previous actions? In other words, could a reasonable jury find that at least one of those two incidents was part of a coherent pattern of racial or retaliatory hostility stretching back to 2006? If so, the Court may consider the earlier, more reprehensible acts; if not, it must confine its consideration to the more innocuous later events.

Viewed in the light most favorable to Wise, the story of his work environment boils down to this: In 2006, Barnes directed a racial epithet at him. See Wise Decl. I, ¶ 7. Wise was upset and he complained – and continued complaining up the chain of command until something was done. See id., ¶¶ 12-13. Simmons, his second-level supervisor, did not like this, and neither did Barnes. The two of them, accordingly, took steps to interfere with Wise's career. See id., ¶¶ 14-40. Barnes tried to have Wise disciplined multiple times and purposefully did not select him for a team-leader position. See id., ¶¶ 21, 34, 36. He also deprived him of two days of training.

See id., ¶ 37.  Similarly, Simmons ordered Wise's direct supervisor to deny him training and

made sure that he was not selected for a position as an engineer.  See id., ¶¶ 14-21; Simmons

Email of Apr. 24, 2008.

Then, in late 2008 or early 2009, things changed.  Wise, at his own request, was

transferred out of the unpleasant environment that was the microfilm lab, away from Barnes and

Simmons.  See Wise Decl. I, ¶¶ 41-42; Wise Depo. I at 82:23-24, 120:1-121:10.  Although they

were still his record supervisors, in practice they had no control over him or his work.  Barnes,

for example, was not in charge of Wise's evaluations.  See Wise Depo. I at 82:23-24.  As far as

the record reflects, Simmons and Barnes had essentially no contact with Wise from the day he

was transferred forward.

The transfer, it must be noted, did not transform Wise's job into a prelapsarian Garden of

Eden.  He was not receiving the sort of ratings or awards he had in his old job; the opportunities

for training and promotion were not the same; and he had, per his transfer agreement, a

production quota.  See Wise Decl. I, ¶¶ 43-45.  This, therefore, was the state of affairs at the time

of the two exhausted incidents regarding the Acting Archivist and the Holocaust Project awardee

list.

To determine whether these last two events are part and parcel of that same toxic

environment that originated in the microfilm lab in 2006, the Court looks at the three Morgan

factors: whether the events involved "the same type of employment actions, occurred relatively

frequently, and were perpetrated by the same managers."  Morgan, 536 U.S. at 120.

The majority of the negative 2006-08 acts against Wise involved similar "type[s] of

employment actions": failures to train or promote and failed attempts at discipline.  Id.  These

events may well have created a hostile work environment; indeed, repeated failures to train and

promote could be severe or pervasive enough to alter a person's working conditions, particularly if coupled with the use of a noxious racial epithet.  The hostile acts, furthermore, were at least somewhat frequent, and they were perpetrated by the same managers – Simmons and Barnes.

Now compare the two complained-of events from 2009 and 2010 to Wise's experience in the microfilm lab:  First, the incident involving Plaintiff's visit to the Acting Archivist's offices was an isolated event.  Being told not to return to the fourth floor to pester the head of an agency is nothing like being denied training or a promotion.  The incident happened only once, and it did not involve Simmons, Barnes, or any other recurring character in the story of Wise's hostile work environment.  There is, moreover, no evidence that would lead a reasonable jury to believe that this event had anything to do with racial hostility or retaliation.  Wise had attempted to contact the Archivist multiple times about the Barnes incident; he had repeatedly been told to speak to the EEO office instead; and yet he insisted on lurking outside the fourth-floor suite, waiting to meet someone he had been told not to contact.  See id., ¶¶ 46-53.  A reminder to follow the rules and not to harass the agency head hardly seems hostile or retaliatory in such circumstances.  That incident, then, was not "part of the same actionable hostile work environment practice" that occurred from 2006 through 2008.  Morgan, 536 U.S. at 120.

The second incident – Wise's omission from the list of Holocaust Project awardees – is a closer call.  At the very least, the incident involved one of the same managers – Barnes – who had harassed Wise in years past.  The similarities, however, end there.  In terms of frequency, the sample size is exactly one: In the two years following his removal from the microfilm lab, Wise recounts only this single incident involving Barnes.  Regarding the type of conduct at issue, omission from the first draft of an award list is also different from failure to train or promote, or even from threats of discipline.  A one-time omission could not reasonably make an employee

feel trapped in a dead-end job in the same way as persistent failures to train or promote. Unlike past incidents, Wise was also not alone in being left off the list – many employees of all races were omitted. <u>See</u> Barnes Depo. at 115:6-117:19; Hamburg Decl., ¶¶ 2-6; Jacobson Decl., ¶¶ 4-6. Like all the omitted employees, Wise got his check and his award in the end. Those circumstances would make it impossible for a jury to infer the racial hostility or retaliatory intent necessary to link this act to Wise's prior hostile environment. This incident, therefore, was also not "part of the same actionable hostile work environment practice" as the conduct in the microfilm lab. <u>Morgan</u>, 536 U.S. at 120.

At bottom, there is a reason why neither of these two incidents seems related to Wise's prior, arguably hostile, work environment: he was <u>removed</u>, at this own request, from that environment. That is just the kind of "intervening action by the employer" that the <u>Morgan</u> court imagined might cut off liability. 536 U.S. at 118. While Wise may not be perfectly satisfied with his new position in the digital-imaging lab, his complaints are not reasonably related to racial or retaliatory hostility. Rather, Wise has been removed from the source of the hostility – Simmons and Barnes – through an intervening act. Even if other Archives supervisors may have displayed some lack of sensitivity – for example, by calling the use of a racial epithet a "cultural thing" and leaving it unaddressed – they nonetheless granted Wise's request for a transfer. No reasonable jury could infer from the two exhausted events the kind of pervasive hostility fostered by the highest echelons at Archives necessary to connect those events with the unpleasant acts of 2006-08.

Other courts have made similar findings in somewhat comparable circumstances. In <u>Wilkie v. Department of Health and Human Services</u>, 638 F.3d 944 (8th Cir. 2011), for example, the Eighth Circuit held that a pattern of incidents in which two managers allegedly fostered

insubordination and criticism toward their colleague were not part of the same hostile work environment created a year earlier, when one of those two managers made persistent sexual advances toward her. The Court reasoned that the earlier pattern of advances was not "similar in nature, frequency, and severity" to the incidents undermining the Plaintiff's authority; therefore, the earlier conduct was time barred. Id. at 952.

In Duncan v. Manager, Department of Safety, 397 F.3d 1300 (10th Cir. 2005), the Tenth Circuit similarly examined the "type of . . . acts, the frequency of the acts, and the perpetrator of the acts" to determine whether hostile incidents that occurred 18 years prior to the filing of the complaint were time barred. Id. at 1309. That Court ultimately determined that prior "frequent instances of threatening physical and psychological harassment" were not linked to "off-color comments and rumor-spreading perpetrated by a completely different set of actors" 18 years later. Id. Allowing litigation over the earlier acts, "which were taken by different individuals so long ago under different circumstances, would frustrate the Congressional purpose in passing a tight deadline for filing Title VII claims." Id.

In Holmes v. Utah Department of Workforce Services, 483 F.3d 1057 (10th Cir. 2007), the Tenth Circuit again barred the litigation of past grievances by holding that a plaintiff could not complain of prior hostilities after she had been transferred out of the allegedly hostile environment. In that case, the plaintiff had been exposed to an environment that was, arguably, pervasively hostile thanks to the sexual advances of one male manager. See id. at 1063-64. The plaintiff was eventually transferred to a different office. See id. When she visited her old office about six months later, her former manager hugged her in an inappropriate manner, and she finally filed suit. See id. at 1063. The Court, however, found that her transfer "constituted an 'intervening act' that separated her from the allegedly hostile work environment." Id. at 1064.

The prior hostile acts were therefore time barred and could not be linked to the incident that occurred during the plaintiff's visit.

Wise's case bears some similarities to the circumstances addressed by those courts. Just as the sexual advances in Wilkie were held to be unconnected to acts fostering insubordination, here Simmons's and Barnes's failure to train and promote Wise are acts of a different type from omission from an awards list or a warning against loitering. See 638 F.3d at 951-52. As in Duncan, the warning on the fourth floor came from "a completely different set of actors" than the prior hostility, and by the time Wise was left off the award list in 2010 the previous harassment had taken place "long ago" and "under different circumstances." 397 F.3d at 1309. Finally, just as in Holmes, Wise was transferred out of the arguably hostile work environment and complained only years later after the persistent harassment had ceased. See 483 F.3d at 1063-64. As the Duncan Court noted, this is a case where allowing Wise to reach back in time and litigate unrelated, untimely, unexhausted claims "would frustrate the Congressional purpose in passing a tight deadline for filing Title VII" suits. 397 F.3d at 1309. Any claim for a hostile work environment, therefore, may not include the stale and unexhausted complaints concerning what occurred in the microfilm lab.

    B.  Hostile Work Environment

Now that those 2006-08 incidents are out, the Court next determines whether a reasonable jury could find that the two exhausted actions by themselves constituted a hostile work environment. Wise must have sufficient evidence of those acts to show "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Baloch, 550 F.3d at 1201 (internal quotation marks omitted). In evaluating such evidence, the Court looks to the

"frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Id. at 1201 (internal quotation marks omitted). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." George, 407 F.3d at 416 (internal quotation marks omitted).

To begin with, two incidents over the course of two years is quite infrequent conduct. The severity and offensiveness of these incidents, moreover, is low: Wise received his award shortly after the ceremony, and steering clear of the Archivist's office is a minor inconvenience, at best. Neither event appears to have affected Wise's work performance in the slightest.

Even if the Court considered that these two events related back to Wise's complaints about his new position in the digital-imaging lab – and that Morgan permitted all post-transfer incidents to be deemed exhausted – Defendant's actions are still not "sufficiently severe or pervasive to alter the conditions of [Wise's] employment and create an abusive working environment." Baloch, 550 F.3d at 1201 (internal quotation marks omitted). Lower ratings – as Wise describes it, getting a "B" rather than an "A" – may be upsetting, as may be lower cash awards or bonuses. Yet, a few less-than-perfect reviews at the start of an entirely new job are not "extreme" enough to constitute a change in the terms and conditions of employment. Neither is a quota that Wise regularly exceeds. See Wise Depo. I at 80:1-17, 121:11-20. Viewed as a totality, these events are not remotely "severe or pervasive" enough to make Wise's new work environment "abusive." Baloch, 550 F.3d at 1201 (internal quotation marks omitted).

In addition, no jury could find that this conduct was linked to racial or retaliatory animus. Wise's prior mistreatment in the microfilm lab counsels the Court to approach its task with caution – if managers at Archives acted unchecked in a retaliatory or race-conscious manner before, perhaps similar conduct could occur again. Even against that backdrop, however, a

reasonable jury could not discern any animus here. Wise's recent evaluations and awards were given by a completely different manager from Simmons and Barnes, and Wise offers no evidence that his new manager harbored any discriminatory intent. See Wise Decl. I, ¶¶ 41-42; Wise Depo. I at 82:23-24. He also does not show that the lower ratings were anything other than part of starting an unfamiliar job. The same lack of evidence impairs Wise's complaints about his pay grade and the lack of opportunities to advance; these are, as far as the evidence shows, just part and parcel of the new position. Nor is Wise alone in this respect: Many other transferees are grade eight, and there is no sign that their opportunities to advance are different from Wise's. See Wise Depo. I at 49:20-59:6. Under those circumstances, no factfinder could infer retaliation or racial hostility toward Plaintiff.

All post-2008 incidents, in sum, even considered together, are not sufficient to overcome the summary-judgment hurdle; indeed, no reasonable jury could find that Wise's work environment from that time forward was hostile, either because of racial animus or retaliatory intent. See Scott, 550 U.S. at 380; Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.

C. Tolling, Estoppel, or Failure to Follow Regulations

Wise raises only one defense to excuse his failure to exhaust administrative remedies: When he spoke to an EEO Counselor at Archives, that Counselor "did not inform him of the process for filing an EEO complaint nor inform him of the short time limits for doing so." Opp. at 35; Opp., Exh. 3 (Declaration of Marlon Wise II), ¶ 9. Wise may be arguing that Archives should be estopped from making the exhaustion argument; that the 45-day limitation should be equitably tolled; or that Archives violated some unspecified regulations related to EEO Complaints. See, e.g., Bayer v. U.S. Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992) (violation of EEO regulations); Barbett v. Logistics Application, Inc., 845 F. Supp. 2d 164, 167-

68 (D.D.C. 2012) (estoppel and tolling). Because he included neither relevant citations nor any mention of a particular legal theory, it is impossible for the Court to know which, if any, of these issues Wise meant to raise.

At any rate, under any applicable legal theory, Wise's argument boils down to the fact that he was never put on notice of how and when to file EEO claims during the time that his work environment was arguably hostile. This, however, is clearly not the case. In fact, Wise filed an EEO complaint while he was working in the microfilm lab in 2007, related to his denial of training opportunities. See Wise Decl. I, ¶¶ 15-16. He later withdrew the complaint. Id. Wise thus clearly understood what he needed to do to file an administrative complaint, as he worked with Archives' EEO Office to do just that. See, e.g., Supp. to Mot., Exh. 8 (Notice to Potential Complainant) at 2-4 (outlining the EEO process, including the 45-day deadline, and signed by Wise in 2007). As he possessed the knowledge and as nothing prevented him from filing, neither estoppel, nor tolling, nor any other relevant defense applies here. See, e.g., Bayer, 956 F.2d at 333; Barbett, 845 F. Supp. 2d at 167-68.

## IV.  Conclusion

Because the claims that were properly exhausted do not constitute a hostile work environment, the Court grants Defendant's Motion for Summary Judgment. A separate Order consistent with this Opinion will be issued this day.


/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  December 11, 2013